IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CASE NO. 4:20-CV-00055-M

CHURCH MUTUAL INSURANCE )
COMPANY, )
       Plaintiff, )
)
v. )     **OPINION AND ORDER**
)
LAKE POINTE ASSISTED LIVING, INC. )
*et al.*, )
       Defendants. )

Plaintiff Church Mutual Insurance Company ("Plaintiff"), through this declaratory-judgment action, asks this court to determine whether or not it is obligated to defend and indemnify Lake Pointe Assisted Living, Inc. and its owners/operators Tony and Edith Bigler ("Lake Pointe Defendants") in ongoing litigation in Craven County Superior Court ("Underlying Lawsuit"). The plaintiffs in the Underlying Lawsuit are joined as defendants in this action ("Resident Defendants") as their rights will ultimately be affected by any court order. This matter is before the court on Plaintiff's Motion for Judgment on the Pleadings ("Motion") [DE-24]. For the reasons that follow, the Motion will be granted in part and denied in part.

1

I.    Factual and Procedural Background

     A. The Underlying Lawsuit[1]

Lake Pointe Assisted Living is an adult care home.[2] FAC ¶ 1, DE-35-1. The facility and its residents entered into identical contracts, entitled the "Home Contract." *Id.* ¶ 17. In exchange for a monthly fee, the contract included several promises to its residents including that "[m]eals would be nutritious"; the facility "would provide assistance with eating, walking, dressing, bathing, personal grooming, ambulating, correspondence, scheduling of appointments, and shopping"; residents would be supervised "on a 24 hour basis"; and group and individual activities would be planned and implemented. *Id.* ¶¶ 18, 23. Additionally, the facility was to provide its residents "with care and services that were in compliance with relevant federal and state laws and rules and regulations" and operate "in compliance with relevant federal and state laws and rules and regulations." *Id.* ¶¶ 20-21.

Because the Lake Pointe Defendants allegedly did not fulfill contractual obligations as promised, the Resident Defendants filed a class action lawsuit in Craven County Superior Court on behalf of themselves and all residents of the facility from December 1, 2014, until the present.[3] *Id.* ¶ 24. The complaint raises three causes of action: breach of contract, violation of the North Carolina Unfair Trade Practices Act ("UTPA"), and negligence. *Id.* ¶¶ 33-61.

---

[1] When the Motion was filed, the Third Amended Complaint ("TAC") was the operative complaint in the Underlying Lawsuit. TAC, DE-1-5. The TAC has since been amended and the Fourth Amended Complaint ("FAC") is now the operative complaint in the Underlying Lawsuit *See* D. Coats Aff. attaching FAC, DE-35. For purposes of recounting the allegations in the Underlying Lawsuit and employing the "comparison test" *infra*, the court will rely on the currently operative complaint, the FAC.

[2] An "adult care home" is an assisted living residence under North Carolina Law. N.C. Gen. Stat. § 131D-2.1(3).

[3] Elsewhere, the FAC indicates that the facility closed in 2018. DE-35-1 ¶ 27.

2

Specific to their breach-of-contract claim are allegations that the Lake Pointe Defendants understaffed the facility, failed to serve nutritious meals, failed to provide activities, and generally failed to comply with the law, rules, and regulations that govern the operation of a licensed adult care home. *Id.* ¶ 36. The core of the UTPA claim is that the Lake Pointe Defendants, not members of a learned profession, engaged in false representations in their marketing brochures and the Home Contract knowing they could not fulfill their promises to residents and that these actions "were driven by greed to increase profit margins." *Id.* ¶¶ 42, 46, 50(d), 52. Finally, the Underlying Lawsuit alleges that Tony and Edith Bigler were negligent in the management and operation of the adult care home. *Id.* ¶ 60. The Resident Defendants seek recovery of economic damages they sustained as a result of these violations. *Id.* ¶ 4.

B. The Insurance Policy

Plaintiff issued two insurance policies to the Lake Pointe Defendants that were in effect from May 1, 2018, through May 1, 2019, a primary policy and an umbrella policy. Mem. in Supp. of Pl.'s Mot. for J. on the Pleadings at 10,[4] DE-25. The primary policy included professional liability coverage and the umbrella policy included a professional liability coverage endorsement to the extent provided by the primary policy. *Id.* at 12-13. With regards to the professional liability coverage, the insurance, in pertinent part, "applies to injury only if: . . . caused by a 'professional health care incident.'" Policy of Insurance Issued to Lake Pointe Assisted Living Facility, Inc. at 217, DE-4-1. The term injury is not defined in the policy. "Professional health care incident" is defined and means:

    a. Any act, error, omission or failure:
        (1) In the furnishing of "professional health care services." This
            includes furnishing of food, beverages, medications or
            appliances in connection with such services;

---

[4] Page references are to the page numbers assigned by the CM/ECF electronic docketing system.

3

          (2) In the handling of deceased human bodies;

          (3) Arising out of service by any persons as members of a formal accreditation, standards review or similar board of the Named Insured or as a person who executes the duties of such board.

     b.  Failure to comply with any right of a resident under any state or federal law regulating you as a resident health care facility;

     c.  Failure to protect any resident from undue influence by an insured when such undue influence is to the personal detriment of the resident.

Any such act, error, omission, or failure, together with all related acts, errors, omissions or failures in the furnishing of "professional health care services" to any one person, shall be considered one "professional health care incident" subject to the Each Claim Limit of Insurance in force at the time the first "professional health care incident" covered by this policy occurred.

*Id.* at 223. Furthermore, "professional health care services" is defined as "professional medical, nursing, cosmetic, social, and similar professional services that relate to the care of your residents."

*Id.*

### C. The Federal Lawsuit

Plaintiff filed a Complaint for Declaratory Judgment against the Lake Pointe and Resident Defendants in this court on March 30, 2020 [DE-1]. The Lake Pointe Defendants filed a Corrected Answer on June 2, 2020, and asserted counterclaims for declaratory judgment, breach of contract, unfair claims practices/trade practices, and breach of the covenant of good faith [DE-16]. The Resident Defendants filed an Answer on June 12, 2020, and asserted counterclaims for declaratory judgment and unfair claims practices/trade practices [DE-17]. Plaintiff filed Answers to the counterclaims on June 18, 2020, and July 1, 2020, respectively [DE-21; DE-22]. Plaintiff filed the Motion [DE-24] and memorandum in support [DE-25] on August 3, 2020. The Resident and Lake Pointe Defendants separately responded in opposition on August 24, 2020 [DE-29; DE-30]. Plaintiff replied on September 8, 2020 [DE-33] and the Motion is ripe for ruling. On October 22, 2020, this court ordered a stay in discovery pending resolution of the Motion [DE-34].

4

The pending Motion seeks three things: (1) a declaration that Plaintiff has no duty to defend the Lake Pointe Defendants because the allegations in the Underlying Lawsuit fall outside the scope of professional liability insurance coverage; (2) a declaration that Plaintiff has no duty to indemnify the Lake Pointe Defendants, for the same reason; and (3) dismissal with prejudice of Defendants' counterclaims against Plaintiff.

II.     Legal Standards

A.  Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings should be granted if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Progress Solar Sols. v. Fire Prot., Inc.*, Nos. 5:17-CV-152-D, 5:19-CV-5-D, 2020 WL 5732621, at *13 (E.D.N.C. Sept. 24, 2020) (citations omitted). The court may consider the pleadings along with any materials referenced in or attached to the pleadings, which are incorporated by reference. *See* Fed. R. Civ. P. 10(c). The same standard of review applies under Rule 12(b)(6) and Rule 12(c). *See, e.g.*, *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). When a court reviews a motion for judgment on the pleadings, it must "construe the facts and reasonable inferences . . . in the light most favorable to the [non-moving party]." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997) (Rule 12(b)(6) motion); *Burbach*, 278 F.3d at 406 (Rule 12(c) motion).

B.  Choice of Law

The parties agree, and the court finds, that the substantive law applicable to Plaintiff's insurance policy is the law of North Carolina. *See* N.C. Gen. Stat. § 58–3–1 ("All contracts of

5

insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof."); *see also Cont'l Cas. Co. v. Physicians Weight Loss Ctrs. of Am., Inc.*, 61 F. App'x 841, 844-45 (4th Cir. 2003) (unpublished) ("Because of constitutional concerns, application of this provision has been limited to situations where there is a 'close connection' between North Carolina and the interests insured by the policy.") (citation omitted). In the instant case, the Plaintiff's policy insures the interests of the Lake Pointe Defendants in their provision of services within the state of North Carolina. DE-25 at 10; DE-35-1 ¶ 1. The policy therefore falls within the plain terms of North Carolina General Statute Section 58–3–1. In addition, the requisite close connection between the insured's interests and North Carolina exists. Lake Pointe Assisted Living—the facility to which Plaintiff's policy was issued—was licensed by the state of North Carolina to operate an adult care home in the state and was home to citizens of the state. DE-1 ¶¶ 3, 6-8.

C. Duties to Defend and Indemnify

    i.  Generally

An insurance policy is a contract and therefore its plain terms and provisions govern the rights and duties of the contracting parties. *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000). The goal "is to arrive at the insurance coverage intended by the parties when the policy was issued." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9, 692 S.E.2d 605, 612 (2010) (citation omitted); *see also Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978) ("[The courts] may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein."). Terms explicitly defined in the agreement are

6

ascribed that meaning; undefined, nontechnical words are given their ordinary meaning unless context clearly requires otherwise; and any ambiguity is resolved against the insurance company. *Woods*, 295 N.C. at 505-06, 246 S.E.2d at 777. North Carolina "follow[s] the rule that provisions of insurance policies and compulsory insurance statutes which extend coverage must be construed liberally so as to provide coverage, whenever possible by reasonable construction." *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986) (citations omitted). Exclusions from coverage, on the other hand, are construed narrowly—again favoring a finding of coverage. *Id.*

Insurance contracts commonly give rise to two related duties, the duty to defend and the narrower duty to indemnify. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986). The "duty to defend refers to the insurer's obligation to defend its insured against claims brought by third parties" while the "duty to indemnify is the duty to pay for settlement or to pay a judgment rendered against an insured." 1 Lexis Nexis Practice Guide: New Appleman N.C. Ins. Litig. §§ 15.02, 4.04 (2020). In other words, "the duty to defend is broader than the duty to indemnify in the sense that an unsubstantiated allegation requires an insurer to defend against it so long as the allegation is of a covered injury[.]" *Harleysville*, 364 N.C. at 7, 692 S.E.2d at 610-11. However, the duty to defend is not without limitation: "even a meritorious allegation cannot obligate an insurer to defend if the alleged injury is not within, or is excluded from, the coverage provided by the insurance policy." *Id.* On the other hand, if there are both covered and uncovered allegations, the insurer's duty to defend extends to the entire action. *Waste Mgmt.*, 315 N.C. at 691 n.2, 340 S.E.2d at 377 n.2 ("[A]llegations of facts that describe a hybrid of covered and excluded events or pleadings that disclose a mere possibility that the insured is liable (and that the potential liability is covered) suffice to impose a duty to defend upon the

7

insure[r]."); *see also Crandell v. Am. Home Assurance Co.*, 183 N.C. App. 437, 440, 644 S.E.2d 604, 606 (2007) (same).

### ii. Comparison Test

To assess whether an insurance policy gives rise to a duty to defend, North Carolina courts employ the comparison test. *Harleysville*, 364 N.C. at 6, 692 S.E.2d at 610. The comparison test entails reading the pleadings alongside the policy to determine whether the events, as alleged, are either covered or excluded.[5] *Id.* All of the facts as alleged are taken as true for this purpose. *Id.* at 7, 692 S.E.2d at 611. Because there are no issues of fact to resolve, determination of the duty to defend is appropriate at the judgment-on-the-pleadings stage. *See Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 414 (4th Cir. 2004) (concluding that the district court could address the insurance-coverage question without having to resolve factual disputes related to causation that would ultimately be determined in the underlying tort suit). By contrast, the duty to indemnify is based upon a comparison of the insurance policy and the facts ultimately determined at trial. *Harleysville*, 364 N.C. at 7, 692 S.E.2d at 611. Thus, whether Plaintiff also has a duty to indemnify is a question that is not yet ripe for adjudication. *See, e.g.*, *Old Republic Ins. Co. v. C&G Express Trucking, LLC*, No. 5:20-CV-00082-M, 2020 WL 2772767, at *3 (E.D.N.C. May 28, 2020) ("The Fourth Circuit recognized that declaratory judgment actions to determine a duty to indemnify prior to the resolution of an insured's liability risk being both premature and notional.").

---

[5] The Lake Pointe Defendants argue that per the North Carolina Supreme Court's decision in *Waste Management*, "this [c]ourt must compare the insuring language of the [p]olicy to the Class Action Order [entered in the Underlying Lawsuit] . . . ." DE-30 at 12, 16-17. Lake Pointe Defendants failed to provide a citation and the court was unable to find support for this proposition in the referenced case. *See Waste Mgmt.*, 315 N.C. at 692, 340 S.E.2d at 378 ("The briefs and portions of the record before this Court include parts of three third-party complaints and a deposition.").

8

III.   Analysis

A.  Scope of Insurance Coverage

The parties do not presently dispute the insurance policy language, the timeliness of the claim, or the allegations in the Underlying Lawsuit. The primary question is whether Plaintiff is obligated to defend the Lake Pointe Defendants against the Resident Defendants' allegations in the Underlying Lawsuit under a reasonable construction of the policy. Plaintiff argues the answer is no because the Underlying Lawsuit does not allege damages because of an "injury" "caused by" a "professional health care incident" as outlined in the insurance policy. Furthermore, Plaintiff makes a policy argument that liability insurance generally cannot and should not be construed to cover contractual obligations and thereby transform an insurer into a silent business partner. DE-25 at 30-31. The court will first address whether the allegations in the FAC constitute a "professional health care incident" as defined by the policy. Because the allegations in the FAC could potentially qualify under two of the policy's five delineated "professional health care incident[s]," the court will address both (1) those stemming from acts, errors, omissions, or failures in the furnishing of professional health care services and (2) those stemming from the failure to comply with any right of a resident under any state or federal law regulating the insured as a resident health care facility. The court will then address Plaintiff's alternative arguments for denying coverage, specifically the policy's use of the terms "injury" and "caused by."

i.  Professional health care incident

1.  Stemming from acts, errors, omissions, or failures in the furnishing of professional health care services

Unlike general liability insurance, professional liability insurance is designed to insure against claims related to acts or omissions in the provision of professional services. North Carolina

9

courts have adopted the following definition of professional services: an act or service "'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.'" *Smith v. Keator*, 21 N.C. App. 102, 105-06, 203 S.E.2d 411, 415 (quoting *Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 14, 157 N.W.2d 870, 872 (1968)), *cert. denied*, 285 N.C. 235, 204 S.E.2d 25, *and aff'd*, 285 N.C. 530, 206 S.E.2d 203, *and appeal dismissed*, 419 U.S. 1043 (1974). In addition, the North Carolina "Supreme Court has noted that [t]he term professional services refers to those services where a professional relationship exists between plaintiff and defendant—such as a physician-patient or attorney-client relationship." *Scott & Jones, Inc. v. Carlton Ins. Agency, Inc.*, 196 N.C. App. 290, 294, 677 S.E.2d 848, 851 (2009) (citing *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 665, 488 S.E.2d 215, 223 (1997) in the context of construing a North Carolina statute) (internal quotation marks omitted).

North Carolina courts examine the nature of the act itself to determine whether it arises out of that person's specialized knowledge—thereby constituting a professional service—instead of focusing on the title of the person performing the act. In *Smith v. Travelers Indemnity Co.*, a North Carolina district court held that an attorney who invested $15,000 for the plaintiff was not covered by the attorney's professional liability policy. 343 F. Supp. 605, 610 (M.D.N.C. 1972) (policy extending coverage for professional services). The court noted "it is sometimes difficult to draw a line between the practice of law and non-legal services since the field of law encompasses such a large area, and the attorney is called upon to use his legal background in many situations." *Id.* at 609. In part, the court looked to the nature of the transaction itself and concluded it "is one that requires no legal skill or training and indeed, is done every day by thousands of individuals who

10

are without legal training but who are probably better qualified in the investment field than most attorneys." *Id.* at 610.

In the health-care context this court in *Hartford Fire Insurance Co. v. St. Paul Fire & Marine Insurance Co.* held that a medical professional liability policy did not cover injuries resulting from a motor vehicle accident that occurred while the insured's employee was transporting a patient in connection with health care services being provided to that patient. 606 F. Supp. 2d 602, 608-09 (E.D.N.C. 2009) (policy extending coverage for professional services). The court concluded driving services did not involve any specialized knowledge that constituted a professional health service. *Id.* at 609-13 ("In the instant case, the driving services provided by [employee] required no type of specialized health care or other specialized skills and could have been performed by any person licensed to drive a passenger car or truck, including [patient]'s mother had she been available to do so on the day in question.").

Similarly—though regarding an insurance policy exclusion, which as discussed above is construed narrowly so as to favor a finding of coverage—the North Carolina Court of Appeals determined that the wrongful death of a dialysis patient occurred not from the treatment itself but rather from a fall that occurred because of an employee's failure to lock casters in place or take other steps to stabilize the chair while the patient rose and that these were not professional services because they do "not require any special skills or training" and "are purely manual." *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 641, 386 S.E.2d 762, 766 (1990).

Though outside the insurance-coverage context, North Carolina courts have found that not all acts performed at a health care facility necessarily involve the specialized skill/knowledge that is the hallmark of professional services. For example, in *Taylor v. Vencor, Inc.*, the court concluded that the failure of a nursing home to supervise a resident whose nightgown caught on fire while

11

she was smoking constituted a claim for ordinary negligence, not for medical malpractice. 136 N.C. App. 528, 530, 525 S.E.2d 201, 203 (2000). The court reasoned that "[p]reventing a patient from dropping a match or a lighted cigarette upon themselves, while in a designated smoking room, does not involve matters of medical science." *Id.* (discussing professional services in the context of whether compliance with North Carolina Rule of Civil Procedure 9(j) for medical malpractice claims was necessary). Likewise in *Lewis v. Setty*, the court held that the failure of a physician to lower an examining table prior to transferring his patient back into a wheelchair was not an activity that fell within the definition of "professional medical services." 130 N.C. App. 606, 608, 503 S.E.2d 673, 674 (1998) (same Rule 9(j)-compliance context).

In two instances where the Fourth Circuit found the complained-of action did fall within the scope of coverage when applying North Carolina law, the focus in the first case was on whether the complained-of act stemmed from the withholding of a professional service and in the second the particular policy language was the determining factor. In *Continental Casualty Co. v. Physicians Weight Loss Centers of America, Inc.*, the Fourth Circuit held that a professional liability insurer had a duty to defend a class action lawsuit alleging a violation of a wide variety of claims, including unfair and deceptive trade practices. 61 F. App'x at 846. The heart of the allegations of the underlying suit were that the defendant and its physicians conspired to force patients to purchase weight loss drugs directly from the defendant, at inflated prices, and refused to give patients prescriptions for the drugs that they could then have filled elsewhere at reduced rates. *Id.* In rejecting the insurer's argument that the underlying suit was not about professional services but rather a pricing dispute, the court concluded that there was coverage because prescription writing is a professional service that involves specialized skill and knowledge to assess whether the prescription is medically indicated, the refusal to write a prescription is the

12

withholding of a professional service, and that the underlying action stemmed from the refusal to issue a prescription. *Id.*

In *Affinity Living Group, LLC v. StarStone Specialty Insurance Co.*, the professional liability insurance policy at issue covered "damages resulting from a claim arising out of a medical incident." 959 F.3d 634, 640 (4th Cir. 2020). The parties agreed that the act of failing to provide personal-care services to residents of an adult-care home constituted a "medical incident" under the insurance policy, which broadly defined the term to include even administrative tasks. *Id.* at 640 n.8-9. The question before the court was whether "arising out of" was sufficiently broad to encompass damages resulting from the submission of fraudulent Medicaid reimbursement claims for services the home never provided as alleged in the underling false-claims-act action. *Id.* at 640-43. Interpreting North Carolina state law, the court held that it was. *Id.* at 642-43.

Here, however, the pertinent part of Plaintiff's insurance policy covers injuries caused by omissions and failures in the furnishing of professional health care services and associated duties, such as furnishing food and medication *in connection* with professional health care services. DE-4-1 at 223 (emphasis added). The court finds that there is no ambiguity in these terms. As the cases above make clear, professional liability insurance does not cover all claims that arise out of everything merely associated with running an adult-care facility. *Cf. Hartford Fire*, 606 F. Supp. 2d at 613 ("Adoption of such a construction—that services provided with health care professional services are by that fact themselves health care professional services—would effectively transform defendant's policy from a professional liability policy into a general liability policy."). As alleged, the various acts that caused the Resident Defendants injury do not involve specialized health-care knowledge, skill, or training and thus cannot constitute the type of professional health care services contemplated by Plaintiff's insurance policy. The allegations of the FAC can be summed up by

13

the following generalized complaint: in an effort to maximize profits, the owners and operators of the facility woefully understaffed it to such an extent that the services and care promised to its residents via the Home Contract could not be fulfilled. This is at base a business decision, and though it certainly has a direct connection to the covered profession and sets the stage for the performance of professional services, it unambiguously is not a health-care decision involving matters of medical science or skill. Notably, the North Carolina General Statutes describe adult care homes as offering only occasional or incidental medical care. N.C. Gen. Stat. § 131E-176(1); *see also* N.C. Gen. Stat. § 131E-101(1) ("[Adult care homes] provide[] residential care for aged or disabled persons whose principal need is a home with the shelter or personal care their age or disability requires. Medical care in an adult care home is usually occasional or incidental, such as may be required in the home of any individual or family, but the administration of medication is supervised.").

Regarding the breach-of-contract claim in particular, Resident Defendants first allege that the facility was staffed at the "bare minimum." DE-35-1 ¶ 36(a). Decisions about the number of staff to employ at the facility clearly affect the facility's ability to perform professional services but do not require health-care skills or training. Next, the Resident Defendants allege that they were not served nutritious meals. *Id.* ¶ 36(b). While possible that the meals were developed by trained nutritionists, medically necessary, or associated with a prescribed medical regimen for the residents, this has not been pled. In fact, the complaint makes clear that no personal injury or wrongful death was suffered as a result of the acts or omissions of the Lake Pointe Defendants. *Id.* ¶ 38. The court will accept the complaint's allegations as true but will not make inferential leaps. *See Harleysville*, 364 N.C. at 7, 692 S.E.2d at 611 ("In addressing the duty to defend, the question is not whether some interpretation of the facts as alleged could possibly bring the injury within the

14

coverage provided by the insurance policy; the question is, assuming the facts as alleged to be true, whether the insurance policy covers that injury."). Therefore, the failure to provide nutritious meals—an act performed daily by food servers all over the world who are without medical or other health-care training—is not, in the context presented, the withholding of professional services. Similarly claims of a failure to provide promised activities, including social services and ten hours of planned group activities, DE-35-1 ¶ 36(c), without indication that these were medically necessary likewise do not constitute the withholding of a health-care professional services. Finally, the allegation that the Lake Pointe Defendants failed to keep in compliance with the law, rules, and regulations that governed the facility as a licensed adult care home, *id.* ¶ 36(d), does not constitute a professional service.

The Resident Defendants' UTPA claim charges that the Lake Pointe Defendants engaged in false and misleading marketing tactics. DE-35-1 ¶¶ 46-47. Marketing decisions are, again, business decisions and not the type of health-care professional service contemplated by the parties when the professional liability health care policy was issued. Finally, the negligence claim is limited to the Biglers' failures in the operation and management of the facility—decision-making that does not involve specialized medical skill or knowledge.

> 2. Stemming from the failure to comply with any right of a resident under any state or federal law regulating you as a resident health care facility

Nevertheless, the insurance policy has significantly broader application by virtue of its incorporation of state law in its definition of a "professional health care incident." Insurance policies that cross-reference bodies of law most often relate to exclusions for criminal acts or omissions. *See e.g.*, *Durham City Bd. of Edu. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 109

N.C. App. 152, 160, 426 S.E.2d 451, 455 (1993). When the policy does not specify the body of law, the courts apply a rule of reasonable construction. For example in a case involving a criminal acts exclusion, the Eigth Circuit opined that "[a]s a party to a contract governed by [state] law, a reasonable insured would understand that a criminal acts exclusion would exclude coverage for acts defined as criminal by the [State] Criminal Code." *Allstate Ins. Co. v. Burrough*, 120 F.3d 834, 840 (8th Cir. 1997); *see also Nationwide Mut. Ins. Co. v. Jones*, No. Civ. JFM-05-2792, 2006 WL 361336, at *4 (D. Md. Feb. 15, 2006) ("The policy excludes from coverage claims for bodily injury 'caused by or resulting from an act or omission which is criminal in nature and committed by an insured.' . . . I interpret ['criminal in nature'] to mean 'defined as criminal by Maryland law.'"). Furthermore, courts have not limited criminal acts to those of a serious nature, such as robbery and murder. *See Horace Mann Ins. Co. v. Drury*, 445 S.E.2d 272, 273-74 (Ga. Ct. App. 1994) (determining that the Georgia-misdemeanor offense of being in illegal possession of firecrackers constituted "a violation of any criminal law or statute" for purposes of homeowner's policy exclusion). A professional liability insurance policy that covered damages resulting from a medical incident, which was defined to include "[f]ailure to comply with any right of a health care facility resident under any state law regulating your business as a resident health care facility," encompassed the facility's violation of the Ohio Nursing Homes Patients' Bill of Rights. *The Corinthian v. Hartford Fire Ins. Co.*, 758 N.E.2d 218, 397-98 (Ohio Ct. App. 2001) (concerning coverage for statutory punitive damages).

Though "resident health care facility," the term used in the insurance policy, appears undefined in the North Carolina statutes, in other contexts "heath care facility" or "health service facility" is explicitly defined to include "adult care homes." *See* N.C. Gen. Stat. § 131E-256(b)(1) (for purposes of a health care personnel registry); § 131E-176(9b) (for purposes of a "certificate

16

of need," designed to limit the construction of health care facilities in North Carolina to those that are needed by the public and that can be operated efficiently and economically for the public's benefit). Therefore, the court will consider an "adult care home" to be a "resident health care facility" as that term is used in the insurance policy.

Assisted living residences are called "adult care home[s]" under North Carolina law. N.C. Gen. Stat. § 131D-2.1(3). Adult-care-home residents are statutorily provided with certain rights. *Id.* § 131D-21 (Declaration of residents' rights). One such right is the right "[t]o receive care and services which are adequate, appropriate, and *in compliance with relevant federal and State laws and rules and regulations*." *Id.* § 131D-21(2) (emphasis added). The licensing of adult care homes is governed by Title 10A of the North Carolina Administrative Code Subchapter 13F and includes, inter alia, requirements regarding the physical structure of the facility, staff qualifications, care and services, and medications.

The resident-care-and-services regulations cover requirements about nutrition and food services and activity programming, among other things. Food requirements include that "[e]ach resident shall be served a minimum of three nutritionally adequate, palatable meals a day at regular hours with at least 10 hours between the breakfast and evening meals." 10A N.C. Admin. Code 13F.0904(d)(1). The regulations also detail the composition of the daily menus for regular diets. *See id.* 13F.0904(d)(3) (milk, fruit, vegetables, eggs, protein, cereals and breads, fats, water and other beverages). Adult care homes are additionally required to "develop a program of activities designed to promote the residents' active involvement with each other, their families, and the community." *Id.* 13F.0905(a). This includes "a minimum of 14 hours of a variety of planned group activities per week." *Id.* 13F.0905(d).

The FAC makes several specific allegations regarding the Lake Pointe Defendants' failures to comply with North Carolina regulations governing the adult care home. The Lake Pointe Defendants "[f]ailed to serve nutritious meals, as promised and as required by 10A NCAC 13F .0904." DE-35-1 ¶ 36(b); *see also id.* ¶ 60. The Lake Pointe Defendants "[f]ailed to provide activities, including social and similar services, that promoted the Plaintiffs and Class Members' active involvement with each other, their families, and the community and provide 10 hours of planned group activities per week, as promised and as required by 10A NCAC 13F .0905." *Id.* ¶ 36(c); *see also id.* ¶ 60. The Lake Pointe Defendants "[f]ailed to ensure that [the facility] materially and routinely complied with the applicable laws, rules and regulations related to the operation of a licensed adult care home, as promised and as required by 10A NCAC 13F." *Id.* ¶ 36(d); *see also id.* ¶ 60. These allegations fall squarely within the scope of the insurance policy's broad, unambiguous language that a "professional health care incident" can stem from violations of "any right of a resident" pursuant to bodies of law that regulate the insured as a resident health care facility.

## ii. Injury

While the term injury is not defined in the policy, Plaintiff suggests that it should be limited to a physical harm or exclude economic loss. DE-25 at 17. The Oxford English Dictionary defines injury as a "[w]rongful action or treatment; violation or infringement of another's rights; suffering or mischief wilfully and unjustly inflicted." *Injury, Oxford English Dictionary*, https://www.oed.com/view/Entry/96114?rskey=AvWNgS&result=1#eid (last visited Jan. 26, 2021). Black's Law Dictionary defines injury as

> [t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice. . . . Anything said or done in breach of a duty not to do it, if harm results to another in person, character, or property. Injuries are divided into real injuries (such as

> wounding) and verbal injuries (such as slander). They may be criminal wrongs (as with assault) or civil wrongs (as with defamation). . . . Some authorities distinguish *harm* from *injury*, holding that while *harm* denotes any personal loss or detriment, *injury* involves an actionable invasion of a legally protected interest.

INJURY, *Black's Law Dictionary* (11th ed. 2019) (citations omitted).

In the primary case to which Plaintiff seeks to analogize, *Security Insurance Group v. Wilkinson*, it was not the nature of the breach-of-contract injury that precluded coverage (as Plaintiff suggests) but rather the person who sustained the injury. John Wilkinson originally sued a hospital for breach of contract arising out of the hospital's agreement to render psychiatric services to his wife. *Sec. Ins. Grp. v. Wilkinson*, 297 So. 2d 113, 113 (Fla. Dist. Ct. App. 1974). His wife and the psychiatrist assigned to treat her developed an emotional connection. *Id.* After her discharge, she divorced Mr. Wilkinson and subsequently committed suicide. *Id.* Mr. Wilkinson was successful in obtaining a judgment against the hospital for a full reimbursement of the money he paid under the contract. *Id.* at 113-14. The hospital's professional liability insurance provider, that refused to defend the Wilkinson suit under its policy, appealed the summary judgment against it for the Wilkinson judgment, attorneys' fees for the hospital's defense of the primary action, and attorneys' fees for the prosecution of the hospital's third-party complaint. *Id.* at 114. The appellate court reversed summary judgment, finding

> [i]n the instant case, the language of the policy provides for injury 'sustained by any Person arising out of malpractice, error or mistake . . . in rendering or failing to render to Such person' medical treatment. This language leads to the inescapable conclusion that the injury must be suffered by the person to whom the medical services were rendered. Had the original suit been one seeking damages for injury to Mrs. Wilkinson or one alleging her wrongful death, the policy would have provided coverage even though the hospital-patient relationship originated by way of contract.

*Id.*

19

Here, in light of the North Carolina rules of construction that one, policies extending coverage should be construed liberally, *State Capital*, 318 N.C. at 538, 350 S.E.2d at 68, and two, that undefined words should be given their ordinary meaning, *Harleysville*, 364 N.C. at 9, 692 S.E.2d at 612, "injury" as used in the instant insurance policy should encompass monetary injury alleged by the Resident Defendants.

### iii. Caused by

Plaintiff focuses on the fact that the policy uses the terms "caused by" instead of the broader "arising out of" language. DE-25 at 26-28; *see State Capital*, 318 N.C. at 539, 350 S.E.2d at 69 ("They [arising out of] are words of much broader significance than 'caused by.'"); *see also Affinity*, 959 F.3d at 642-43 (finding that the broad "arising out of" language in an professional liability insurance policy encompassed allegations of false medical billing in a false-claims-act suit). Here, unlike the more tenuous medical billing issue in *Affinity*, the Defendants do not need the broad "arising out of" language to correctly assert that the Lake Pointe Defendants are entitled to coverage. The injuries alleged in the FAC were directly caused by Lake Pointe Defendants' failure to fulfill their contractual promises made via the Home Contract.

Having decided that certain allegations in the FAC do fall within the insurance policy's definition of a "professional health care incident," this establishes Plaintiff's duty to defend on all claims asserted against the Lake Pointe Defendants in the Underlying Lawsuit. *See Waste Mgmt.*, 315 N.C. at 691 n.2, 340 S.E.2d at 377 n.2. The Defendants' alternative argument regarding estoppel need not be considered.

### B. Defendants' Counterclaims Against Plaintiff

The Lake Pointe Defendants filed counterclaims against Plaintiff for (1) declaratory judgment that there exists a duty to defend and indemnify, (2) breach of contract, (3) unfair claims

practices/trade practices, and (4) breach of the covenant of good faith stemming from the Plaintiff's failure to carry out its obligations under the policy. *See generally* Lake Pointe Defs.' Answer & Counterclaim ¶¶ 47-82, DE-16. Similarly, the Resident Defendants filed counterclaims against Plaintiff for (1) declaratory judgment that there exists a duty to defend and indemnify the Lake Pointe Defendants and (2) for unfair claims practices/trade practices. *See generally*, Resident Defs.' Answer & Counterclaim ¶¶ 90-103, DE-17. The court has already determined that there is duty to defend and will defer ruling on the question of indemnity because it is not yet ripe, see *supra* Parts II.C.ii., III.A, therefore the Lake Pointe Defendants' and Resident Defendants' respective first counterclaim for declaratory judgment has been decided.

Plaintiff's argument for the dismissal of the Lake Pointe Defendants' remaining counterclaims hinges on its contention that there is no duty to defend. Where there is no duty to defend, an insured cannot have a valid claim or legal entitlement to insurance coverage. DE-25 at 32-33. Because this issue has been determined against the Plaintiff and Plaintiff failed to provide the court with an alternative basis for dismissing Lake Pointe Defendants' counterclaims two through four, the court will decline to dismiss them at this juncture.

In arguing for the dismissal of the Resident Defendants' remaining counterclaim, Plaintiff asserts that they lack standing. DE-25 at 34; DE-33 at 9-10. The court agrees. "The concept of standing—which requires that the plaintiff have a sufficiently personal stake in the outcome of the litigation—forms an indispensable part of the Article III case-or-controversy requirement." *Miller v. Augusta Mut. Ins. Co.*, 157 F. App'x 632, 635 (4th Cir. 2005) (unpublished). Standing requires a litigant to demonstrate an "(1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision." *Retail Indus. Leaders Assoc. v. Fielder*, 475 F.3d 180, 186 n.1 (4th Cir. 2007) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

21

560-61 (1992)). To satisfy the injury-in-fact element of this test, a plaintiff must have "suffered . . . an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 560-61). Particularly in the context of potential third-party beneficiaries to insurance contracts, state law informs whether there has been an invasion of a legally protected interest.[6] *Compare Scottsdale Ins. Co. v. B & G Fitness Ctr., Inc.*, No. 4:14-CV-187-F, 2015 WL 4641530, at \*4 (E.D.N.C. Aug. 4, 2015) (determining third-party claimants did not have a legally protected interest where North Carolina caselaw establishes that without being parties to the contract at issue, or having some other legally enforceable right under the contract, such as by way of judgment, incidental beneficiaries of an insurance policy lacked standing to have the insurance contract construed) *with Lott v. Scottsdale Ins. Co.*, 811 F. Supp. 2d 1224, 1230 (E.D. Va. 2011) (determining that the parents of a child who drowned in a pool during a party at a swim club satisfied the injury-in-fact requirement where Virginia law confers on tort claimants the right to sue on the policy as a third-party beneficiary and further cements status as third-party beneficiary at the moment of injury as opposed to final judgment). "North Carolina does not recognize a cause of action for third-party claimants against the insurance company of an adverse party based on unfair and deceptive trade practices." *Wilson v. Wilson*, 121 N.C. App. 662, 665, 468 S.E.2d 495, 497 (1996); *see also USA Trouser, S.A. de C.V. v. Williams*, 258 N.C. App. 192, 196, 812 S.E.2d 373, 376-77 (acknowledging that *Wilson* remains the controlling case regarding direct actions by third-parties against an insured's insurer while noting

---

[6] The Resident Defendants' reliance on *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) is inapposite. As pointed out by the Plaintiff, DE-33 at 9 n.2, the question there was whether an insurer's action, against an insured and third-party beneficiary, for declaratory judgment that it was not bound to defend or indemnify in an underlying state court case constituted an actual controversy.

that an exception was created for injured parties in an automobile accident), *denying review*, 371 N.C. 448, 817 S.E.2d 199 (2018). The Resident Defendants concede this point but argue alternatively that the rule should not apply based on policy considerations or "their direct unfairness claim." DE-29 at 8-10. It is not the role of a federal district court to expand state law. *Grayson v. Anderson*, 816 F.3d 262, 265, 272 (4th Cir. 2016). Here the Resident Defendants cannot satisfy the injury-in-fact element. At best, they are potential, incidental beneficiaries to the insurance contract at issue and this does not give rise to any legally protected interest under North Carolina law. The Resident Defendants second counterclaim for unfair and deceptive trade practices must therefore be dismissed.

IV.     Conclusion

For the reasons discussed above, Plaintiff's Motion [DE-24] is GRANTED IN PART AND DENIED IN PART. Plaintiff's request for a declaration that Plaintiff has no duty to defend the Lake Pointe Defendants is DENIED. Plaintiff's request for a declaration that Plaintiff has no duty to indemnify the Lake Pointe Defendants is DENIED WITHOUT PREJUDICE; the issue is not yet ripe for adjudication. Plaintiff's request to dismiss Lake Pointe Defendants' counterclaim one and Resident Defendants' counterclaim one is DENIED AS MOOT; Plaintiff's request to dismiss with prejudice Lake Pointe Defendants' remaining counterclaims two through four is DENIED WITHOUT PREJUDICE; these counterclaims will proceed. Plaintiff's request to dismiss with prejudice Resident Defendants' remaining counterclaim two is GRANTED.

SO ORDERED this the $4^{TL}$ day of February, 2021.

Richard E Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

23